**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-9189

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS MANAGER FOR THE FSLIC RESOLUTION FUND,

Plaintiff-Appellant,

versus

UNITED STATES FIRE INSURANCE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
For the Northern District of Texas,

(April 12, 1995)

Before REYNALDO G. GARZA, DeMOSS and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

This is the second interlocutory appeal of an attorney disqualification order. In the underlying litigation, plaintiff-appellant, the Federal Deposit Insurance Corporation ("FDIC"), successor to the rights of Irving Savings Association ("Irving Savings"), seeks to recover on an insurance policy issued by defendant-appellee, the United States Fire Insurance Company ("U.S. Fire"). To establish certain of its affirmative defenses, U.S. Fire

1

plans to call as witnesses Ann Kenney and Jeff Hurt, two of the attorneys representing the FDIC. U.S. Fire moved the district court to disqualify Kenney, Hurt, and their law firm, Leonard, Marsh, Hurt, Terry & Blinn, P.C. ("LMHT&B" or "the firm"), asserting that the FDIC would be prejudiced if its attorneys served as both advocates and witnesses at trial. The district court granted U.S. Fire's motion to disqualify despite the FDIC's informed consent to the representation. In the first appeal, we remanded the cause for reconsideration in light of recent precedents. On remand, the district court granted U.S. Fire's motion a second time and ordered attorneys Kenney and Hurt, and LMHT&B, disqualified from representing the FDIC in this case. Once again, the FDIC appealed, challenging the disqualification of Hurt and the law firm, but not appealing Kenney's disqualification. We AFFIRM the district court's order as to the disqualification of Hurt. We VACATE the order to the extent that it disqualifies LMHT&B, and we REMAND the matter to the district court with instructions to deny the motion as to LMHT&B.

## I.  FACTUAL BACKGROUND

In December 1982, U.S. Fire issued a savings and loan blanket bond to Irving Savings. The bond insured against certain losses that the savings and loan might suffer, including those arising from the fraudulent or dishonest conduct of Irving Savings' employees. Under the terms of the bond, Irving Savings was covered

2

for losses incurred through dishonesty only if it filed notice and proof of loss with U.S. Fire no more than 100 days after discovering the dishonesty.

In 1984 Irving Savings retained Hurt and LMHT&B to represent it in several out-of-state collection matters. Earl Hall, a deputy commissioner of the Texas Savings and Loan Department ("TSLD"), contacted Hurt on behalf of Irving Savings in late August. In September 1984, with the concurrence of Hall and the TSLD, Irving Savings formally engaged LMHT&B to help collect on some of its loans. The savings and loan, under the direction of the TSLD, turned over various loan transactions to Hurt within the next few weeks. On November 8, 1984, Hurt attended a meeting of the board of directors of Irving Savings. At this meeting, the directors discussed problem loans. According to the minutes of the meeting, Hurt notified the board that it appeared that various officers of Irving Savings had breached their fiduciary duties by making loans that were uncollectible. Hurt stated that in his opinion some of these loans had been uncollectible at the time they were made.

Hurt soon turned over day-to-day management of the Irving Savings collection effort to Kenney, then an associate with LMHT&B. By the first quarter of 1985, Kenney was Irving Savings' primary contact at LMHT&B, and the savings and loan was referring matters directly to her. One of Kenney's responsibilities was to serve as a conduit for information between Irving Savings, its out-of-state counsel, and another law firm employed by Irving Savings, Jenkins & Gilchrist. Ronald Rosener was Irving Savings' primary contact at

Jenkins & Gilchrist.

Irving Savings retained John C. Eichman of Jenkins & Gilchrist in the spring of 1985 to investigate the possibility of a bond claim. On May 17, 1985, Eichman sent U.S. Fire a written notice of loss on behalf of Irving Savings. At Eichman's request, Kenney sent letters to Irving Savings' out-of-state counsel inquiring about potential bond claims. Kenny prepared a written summary, dated June 21, 1985, which contained information she had received from these out-of-state counsel, out-of-state publications, Irving Savings, and Jenkins & Gilchrist attorneys. Based on the information he received from Kenney and others, Eichman filed a claim with U.S. Fire alleging a covered loss arising out of the dishonesty of four Irving Savings employees.[1] He prepared a proof of loss on behalf of Irving Savings and sent it to U.S. Fire on August 14, 1985.

On July 21, 1986, Jenkins & Gilchrist turned over representation of Irving Savings on the bond claim to LMHT&B. From that date until December 10, 1987, Kenny acted as the liaison between Irving Savings and U.S. Fire's retained counsel, the Law Offices of Paul Vernon. In August or September 1986, Vernon turned over the investigation to his associate Mike Duray.

The parties disagree about how to characterize what happened next. Kenney was not immediately forthcoming with all of the paperwork requested by Duray. On the ground that they contained

---

[1] Irving Savings later broadened the claim to include the dishonesty of a fifth employee. An additional claim was made against the former president of Irving Savings for acts of negligence.

privileged communications, she redacted portions of the minutes of Irving Savings' board of directors meetings before sending them to Duray. Kenney did not provide copies of some other documents specifically requested by Duray. She also delayed executing an amended reservation of rights agreement for several months despite Duray's repeated inquiries. Duray and U.S. Fire accuse Kenney of deliberate obstruction and bad faith. Kenny and the FDIC characterize her conduct as innocent error or oversight.

## II.  PROCEDURAL BACKGROUND

On December 10, 1987, Irving Savings filed a complaint in the district court, alleging that U.S. Fire had breached its contractual obligations under the blanket bond. U.S. Fire answered the lawsuit and denied liability under the bond. Shortly thereafter Irving Savings was declared insolvent and the Federal Savings and Loan Insurance Corporation ("FSLIC") was named as receiver.

U.S. Fire filed a motion to disqualify Kenney and Hurt as counsel for the FSLIC on the ground that they might be called as witnesses. On July 21, 1989, Irving Savings amended its complaint to include an allegation of a breach of duty of good faith. In its second amended answer, U.S. Fire asserted 21 affirmative defenses, including three that are relevant to the issue of attorney disqualification: comparative bad faith, discovery, and takeover. Appellant FDIC was formally substituted for the FSLIC as plaintiff in the litigation on January 3, 1990. Three weeks later, U.S. Fire filed a supplemental motion to disqualify counsel for the FDIC.

In June 1991, the district court held a three-day evidentiary

hearing on U.S. Fire's motions to disqualify the FDIC's counsel. At the hearing, U.S. Fire called as witnesses Robert Nelson, the former executive vice-president and treasurer of Irving Savings, and Duray, Kenney, and Hurt. Irving Savings cross-examined each of the witnesses, and additionally, midway through its cross-examination of Kenney and just before the hearing was recessed at the end of the second day, Irving Savings called as a witness Robert DeHenzel, senior attorney in the FDIC's professional liability section. DeHenzel testified that he was familiar with both the motion to disqualify FDIC's counsel and the testimony of the previous three witnesses. As the FDIC supervisor responsible for the instant action, DeHenzel verified that the FDIC consented to the continuation of LMHT&B as counsel despite U.S. Fire's argument that the FDIC might be prejudiced by the continued representation of the firm. Notwithstanding this consent, after the evidentiary hearing, the district court signed an order granting U.S. Fire's motion to disqualify Kenney and Hurt, and the law firm LMHT&B.

Pursuant to 28 U.S.C. § 1292(b), the district court granted certification and we granted leave for an interlocutory appeal. After briefing and oral argument, we vacated the order of the district court and remanded the matter for reconsideration in light of In re American Airlines, Inc., 972 F.2d 605 (5th Cir. 1992), cert. denied 113 S. Ct. 1262 (1993), and In re Dresser Industries, Inc., 972 F.2d 540 (5th Cir. 1992).

On remand, the district court again ordered that Kenney, Hurt,

and LMHT&B be disqualified as counsel for the FDIC. The district court based its analysis of U.S. Fire's disqualification defenses -- bad faith, discovery, and takeover[2] -- on joint application of three different canons of ethics, the Texas Disciplinary Rules of Professional Conduct ("Texas Rules"),[3] the American Bar Association

---

[2] Although takeover is the third defense relevant to U.S. Fire's disqualification motion, the takeover issue is not before us in this interlocutory appeal. U.S. Fire had contended that the TSLD and the Federal Home Loan Bank Board took over Irving Savings in the fall of 1984 and that consequently, under the terms of the bond, coverage was terminated at that time. The FDIC argued that Kenney and Hurt are not necessary witnesses on this issue, because whatever knowledge they possess about the takeover is also known by many former Irving Savings employees. After consulting the relevant ethical canons, the district court concluded that U.S. Fire's takeover theory did not justify the disqualification of LMHT&B. U.S. Fire has not cross-appealed the district court ruling on this defense. Therefore, we do not address the question of takeover.

[3] Patterned after the Model Rules, the Texas Rules came into effect January 1, 1990. Texas Rule 3.08, Lawyer as a Witness, provides:
"(a) A lawyer shall not accept or continue employment in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:
(1) the testimony relates to an uncontested issue;
(2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
(3) the testimony relates to the nature and value of legal services rendered in the case;
(4) the lawyer is a party to the action and is appearing pro se; or
(5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure.
(c) Without the client's informed consent, a lawyer may

7

Model Rules of Professional Conduct ("Model Rules"),[4] and the ABA

Model Code of Professional Responsibility ("Model Code").[5]

not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as an advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter."
SUPREME COURT OF TEXAS, RULES GOVERNING THE STATE BAR OF TEXAS art. X, § 9 (Texas Disciplinary Rules of Professional Conduct) Rule 3.08 (Vernon 1990).

[4] The ABA adopted the Model Rules in 1983 as a replacement for the Model Code. The Model Rule that addresses attorney disqualification is Rule 3.7, Lawyer as Witness:
"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work a substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by rule 1.7 or rule 1.9."
MODEL RULES OF PROFESSIONAL CONDUCT, Rule 3.7 (1992).

[5] In DR 5-102, Withdrawal as Counsel When the Lawyer Becomes a Witness, the Model Code provides:
"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."
MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 5-102 (1980).

Although these rules promulgate conflicting standards, the lower court concluded that all three required disqualification of the FDIC's counsel.

U.S. Fire bases its bad faith defense on Kenney's conduct during the claim investigation. Finding that Kenney may be called as a witness on behalf of the FDIC, the district court disqualified her under Texas Rule 3.08(a), Model Rule 3.7(a), and Model Code DR 5-102(A). Additionally, predicated on the charge of bad faith, the district court concluded that Model Rules 1.7(b)[6] and 1.10(a)[7],

---

[6] RULE 1.7 Conflict of Interest: General Rule
"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation.
When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."
MODEL RULE 1.7 (1992).

[7] RULE 1.10 Imputed Disqualification: General Rule
"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
(b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
 (1) the matter is the same or substantially related to that in which the formerly associated lawyer

9

regarding conflict of interest, Model Code DR 5-102(A), and "questions of ethics and judicial integrity" required disqualification of the entire firm.

U.S. Fire asserted in its discovery defense that coverage under the blanket bond was voided because Irving Savings discovered the claimed dishonesty more than 100 days before filing its proof of loss. The district court determined that both Kenney and Hurt ought to be called as witnesses on behalf of the FDIC to establish the date of discovery, and therefore disqualified both attorneys. However, the district court found that U.S. Fire's discovery defense did not justify disqualification of LMHT&B.

For these reasons, the district court disqualified both of the individual attorneys, Kenney and Hurt, and the law firm, LMHT&B. The district court disqualified Kenney because, to rebut the claim of bad faith, she would likely testify on behalf of her client, the FDIC. Kenney was disqualified with regard to the discovery charge as well, because her testimony on that issue might be adverse to the FDIC. Hurt was disqualified because his testimony relative to the discovery issue might be adverse to the FDIC. Additionally, the district court found that the entire LMHT&B law firm must withdraw as a result of U.S. Fire's bad faith defense.

---

> represented the client; and
> > (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter.
> > (c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7."

MODEL RULE 1.10 (1992).

After granting U.S. Fire's disqualification motion a second time, the district court entered another order of certification allowing appeal under 28 U.S.C. § 1992(b). Once more we granted the FDIC permission to appeal. Accordingly, the FDIC appeals the disqualification of Hurt and LMHT&B. The FDIC does not appeal the disqualification of Kenney on the basis of her status as a possible witness; however, the FDIC challenges the district court's finding of conflict of interest between itself and Kenney, which served as a basis for disqualification of the firm.

## III. STANDARD OF REVIEW

Fifth Circuit case law is not entirely clear on the proper standard of review for the grant or denial of a motion to disqualify counsel. The two cases that prompted remand of this case on the first appeal, Dresser, 972 F.2d at 540, and American Airlines, 972 F.2d at 605, were not direct appeals; both were mandamus cases requiring a more stringent standard of review. The Dresser opinion, however, discussed in a footnote what the proper standard of review would be on a direct appeal:

> "On appeal, the standard of review for the grant or denial of a motion to disqualify would be for abuse of discretion. Underlying determinations would be reversed if findings of fact are clearly erroneous, but the ethical standards applied would be carefully examined."

Dresser, 972 F.2d at 542 n.4 (internal citations and quotation marks omitted). Dresser also contained language suggesting that the "careful examination" of the district court's application of the rules constituted a de novo standard of review:

> "In evaluating a motion to disqualify, we interpret the controlling ethical norms governing professional conduct

11

> as we would any other source of law. When the facts are undisputed, district courts enjoy no particular advantage over appellate courts in formulating ethical rules to govern motions to disqualify. Thus, in the event an appropriate standard for disqualification is based on a state's disciplinary rules, a court of appeals should consider the district court's interpretation of the state disciplinary rules as an interpretation of law, subject essentially to de novo consideration."

Dresser, 972 F.2d at 543 (citations omitted). Our post-Dresser disqualification cases, such as Resolution Trust Corp. v. Bright, 6 F.3d 336, 339 (5th Cir. 1993), have picked up on this overall "abuse of discretion" standard, which includes "clear error" review of fact-findings and de novo "careful examination" of the district court's application of the relevant rules:

> "In the specific context of a disqualification motion, this circuit reviews fact findings for `clear error' while `carefully examining' the district court's application of relevant ethical standards."

Bright, 6 F.3d at 336 (citing American Airlines, 972 F.2d at 609). A more recent Fifth Circuit case on disqualification states simply that "we review the rulings only for abuse of discretion." Forsyth v. Barr, 19 F.3d 1527 (5th Cir.), cert. denied sub nom., Forsyth v. Vines, 115 S. Ct. 195 (1994)(citing Dresser, 972 F.2d at 542 n.4)(affirming attorney disqualification based on conflict of interest finding); see also 1 STEVEN A. CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 4.08, at 4-55 (2nd ed. 1992)("Disqualification of counsel for conflict of interest has been reviewed for abuse of discretion.")(citing cases from the First Circuit, Ninth Circuit and Federal Circuit). The proper standard of review for this appeal, then, is an abuse of discretion standard. But in applying this standard, we will review fact-

12

findings for clear error, and we will perform a "careful examination," or <u>de</u> <u>novo</u> review, of the district court's application of the relevant rules of attorney conduct.

## IV. ANALYSIS

The proscription against an attorney serving as both an advocate and a witness in the same litigation is a long-standing ethical rule. Its origin may be traced to the common law principle of evidence that neither a party nor his agent is competent as a witness on the party's behalf. During the nineteenth century, the prohibition against lawyer-witnesses became a matter of professional ethics. Bar associations in the United States included the rule among their earliest standards of professional behavior.[8] Over the years, various reasons have been offered for an ethical prohibition against advocates testifying. The Model Code proposes four justifications for the rule: (1) the lawyer may be a less effective witness because he is more easily impeachable for interest; (2) opposing counsel may be inhibited in challenging the credibility of a lawyer who also appears as an advocate; (3) a

---

[8] The Alabama State Bar Association adopted the first code of ethics governing attorneys in the United States in 1887. Rule 18 of the code provided:

"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court on behalf of his client."

H. DRINKER, LEGAL ETHICS, app. E (1953) (cited in James B. Lewis, <u>The Ethical Dilemma of the Testifying Advocate: Fact or Fancy?</u>, 19 HOUS. L. REV. 75, 81 (1981)). In 1908 the ABA adopted this rule verbatim as Canon 19 of the Canons of Professional Ethics, the immediate predecessor of the Model Code.

lawyer-witness must argue his own credibility; and (4), while the role of a witness is to objectively relate facts, the role of an advocate is to advance his client's cause. Another rationale commonly advanced for the rule focuses on the appearance of impropriety that may be created when a lawyer testifies on behalf of his client. For one or more of the foregoing reasons, the general prohibition against the lawyer-witness remains a prescript reiterated in many contemporary ethical canons.

In American Airlines, 972 F.2d at 605, we made clear that "disqualification cases are governed by state and national ethical standards adopted by the court." Id. at 610. At least four separate ethical canons are relevant to a review of the district court's order to disqualify counsel in the instant case. Each of these different sets of rules specifically addresses the issue of a lawyer serving as witness. As authorized by 28 U.S.C. § 2071, district courts such as the Northern District of Texas may adopt rules for the conduct of attorneys. The local rules promulgated by the local court itself are the most immediate source of guidance for a district court.[9] Therefore, the Local Rules of the United States District Court for the Northern District of Texas ("Northern

---

[9]  Although we emphasized the state and national rules in Dresser and American Airlines, it should be noted that we did not disregard the local rule. Both of those cases were reviewed on appeal from the Southern District of Texas, which had adopted the Texas Rules for its own Code of Professional Responsibility.

14

District Rules"), are not irrelevant to our inquiry.[10] Nonetheless,

parties cannot be deprived of the right to counsel of their choice

on the basis of local rules alone. Dresser, 972 F.2d at 543. Local

rules are not the "sole" authority governing motions to disqualify

counsel. Motions to disqualify are substantive motions. Therefore,

they are decided under federal law. When reviewing the

---

[10] The local rule governing a lawyer-witness in the Northern District of Texas was adopted by the Northern District in 1977 and became effective on March 1, 1978. The rule was amended slightly in 1985. Local Rule 13.8: Attorney as a Witness, currently reads:

"(a) Acceptance of Employment. An attorney shall not accept employment in contemplated or pending litigation if he knows, or if it is obvious, that he or an attorney in his firm ought to be called as a witness on behalf of the client, except that the attorney may undertake the employment and he or an attorney in his firm may testify:

(1) if the testimony will relate solely to an uncontested matter.

(2) if the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) if the testimony will relate solely to the nature and value of legal services rendered in the case by the attorney or his firm to the client.

(4) as to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the attorney or his firm as counsel in the particular case.

(b) Withdrawal From Representation. If, after undertaking employment in contemplated or pending litigation, an attorney learns or it is obvious that he or an attorney in his firm ought to be called as a witness on behalf of the client, the attorney and his firm shall withdraw from the conduct of the trial and continued representation, unless one of the exceptions listed in (a) is applicable.

(c) Testimony Prejudicial to Client. If, after undertaking employment in contemplated or pending litigation, an attorney learns or it is obvious that he or an attorney in his firm may be called as a witness other than on behalf of his client, the attorney and his firm may continue the representation until it is apparent that his testimony is or may be prejudicial to the client."

LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, Rule 13.8 (1985).

15

disqualification of an attorney, we must "consider the motion governed by the ethical rules announced by the national profession in the light of the public interest and the litigant's rights." Id. The norms embodied in the Model Rules and the Model Code are relevant to our inquiry, "as the national standards utilized by this circuit in ruling on disqualification motions." American Airlines, 972 F.2d at 610. Additionally, consideration of the Texas Rules is also necessary, because they govern attorneys practicing in Texas generally, and because the Northern District Rules contain language virtually identical to the state canon. By consulting these four sets of governing rules, we must weigh the need for disqualification of the FDIC's counsel in reference to the relevant affirmative defenses raised by U.S. Fire. Unfortunately, the rules do not enunciate a common standard. The Northern District Rules, the Texas Rules, the Model Rules, and the Model Code delineate dissimilar, arguably contradictory, rules for dealing with lawyer-witnesses. Therefore, we must weigh the relative merits of each of the various competing disqualification rules as we proceed through each successive step of our analysis.

The Firm

The disqualification of the entire LMHT&B law firm is the most sweeping result sought by U.S. Fire in its motion to disqualify. This is an interlocutory inquiry of profound significance. The ability of the FDIC to present its case at trial will be impacted substantially if the firm that the FDIC has chosen to represent it must withdraw. Depriving a party of the right to be represented by

16

the attorney of his or her choice is a penalty that must not be imposed without careful consideration. Resolution of the firm disqualification issue, however, is complicated by questions of consent, conflict of interest, and imputed disqualification. In the instant case, the district court found that bad faith was the only affirmative defense that required the disqualification of LMHT&B. Two different theories were advanced to support the bad faith disqualification of the firm. First, after finding a conflict of interest between Kenny and the FDIC, the district court determined that, under the Model Rules, LMHT&B must withdraw. Second, although contrary to the express language of Texas Rule 3.08, the district court disregarded the FDIC's consent to continued representation by LMHT&B, and, in deference to a perceived potential for an appearance of impropriety, chose to disqualify the firm. We believe that in both of these respects the district court misapplied the rules. The district court correctly noted that its analysis must include a balancing of competing interests. However, application of ethical rules, such as those involved in the instant case, requires "painstaking analysis of the facts and precise application of precedent." Brennan's, Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168, 173-74 (5th Cir. 1979)(quoting United States v. Standard Oil Co., 136 F. Supp. 345, 367 (S.D.N.Y. 1955)). On the peculiar facts of this case, we find that the lawyer-witness rule does not mandate disqualification of LMHT&B and that, therefore, the law firm may continue on behalf of the FDIC.

17

## 1. Kenney's Disqualification for Conflict of Interest

Kenney's disqualification, and the reasons for it, are central to the district court's finding as to LMHT&B. Although the FDIC does not appeal the disqualification of Kenney as an advocate at trial under the lawyer-witness rule,[11] the FDIC does contest disqualification of the firm based on the district court's additional finding of a conflict of interest as to Kenney. Therefore, the distinction drawn between these two grounds for disqualification is more than merely academic. Disqualification of LMHT&B in this case is unwarranted unless there is a true conflict of interest between Kenny and her client, the FDIC. We conclude that there is not.

The FDIC concedes that Kenney is a likely witness at trial, both for U.S. Fire, which might call her to testify to establish when Irving Savings discovered the claimed dishonesty, and for the FDIC, which will probably have to call her as a witness to rebut U.S. Fire's charge of bad faith. The rules promulgated in three of the governing ethical canons are relatively straightforward, albeit conflicting.  The Northern District Rules, the Texas Rules, and the

---

[11]  Kenney will likely need to testify on behalf of the FDIC to rebut Duray's accusation of bad faith. Both the Northern District Rules and the Model Code mandate Kenney's withdrawal. The FDIC does not dispute this.

Model Code do not require a conflict of interest analysis.[12] In contrast, the lawyer-witness prescript in the Model Rules specifically references the Model Rules' general rule on conflict of interest.

Unless an impermissible conflict of interest exists between a testifying lawyer and her client, Model Rule 3.7, "Lawyer as Witness," does not mandate the vicarious disqualification of the lawyer's firm. U.S. Fire argues that a conflict of interest arises in connection with its bad faith defense, where Kenney's conduct is at issue. U.S. Fire contends that the FDIC may have a claim against Kenney and her firm if the FDIC's claim against U.S. Fire is ultimately defeated on the basis of Kenney's actions. Consequently, it is possible that, sometime in the future, the interests of Kenney and the FDIC might diverge. U.S. Fire contends that this potential conflict of interest between Kenney and her client requires the disqualification of Kenney and the imputed disqualification of her entire firm.

We find that the remote possibility that Kenney and the FDIC may eventually find themselves at odds is much too tenuous a thread to support the  burdensome sanction of law firm disqualification. In finding that Kenney had a conflict of interest, the district court quoted from the comment to Model Rule 1.7: "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client

---

[12]  Conflict of interest is not mentioned in the Texas lawyer-witness rule itself, although it is referred to in passing in the comment to the rule. TEXAS RULE 3.08, Cmt. 10 (1990).

detached advice." An examination of the context in which this passage appears indicates that the ABA drafting committee was primarily concerned with economic conflicts of interest -- for example, those involving fees or business enterprises in which the lawyer has an undisclosed interest. Notwithstanding one hypothetical scenario wherein the interests of Kenney and the FDIC might be characterized as tangentially conflicting, Kenney's interests are otherwise consistent with those of her client. Just as it is in the interest of U.S. Fire to show comparative bad faith, it is in the interest of both Kenney and the FDIC to disprove it.

Furthermore, a client may consent to representation despite a possible conflict. Model Rule 1.7, dealing with the disqualification of a single attorney, and Model Rule 1.10, dealing with the imputed disqualification of his firm, provide that disqualification is unnecessary where a client consents after consultation. The corresponding rule published in the 1990 draft of the Restatement of The Law Governing Lawyers is indicative of the national consensus on this issue within the profession.[13] Moreover,

---

[13] Chapter 8, Conflicts of Interest, § 206 states: "Unless the affected client consents to the representation under the conditions and limitations provided in § 202, a lawyer may not undertake or continue to represent a client if a substantial risk exists that a financial or other personal interest of the lawyer will materially and adversely affect the lawyer's representation of the client." RESTATEMENT OF THE LAW: THE LAW GOVERNING LAWYERS Ch. 8, § 206 (Tentative Draft No. 3, 1990).

§ 202 provides, in pertinent part, "Informed consent requires that the client have adequate information about the risks and advantages of such representation to that client."

consistent with the national norm, the Texas rule on conflict of interest provides for client consent after full disclosure. It is undisputed that the FDIC has given its consent to continued representation by LMHT&B. Therefore, we hold that the disqualification of the firm was inappropriate.

As we explained in Dresser, 972 F.2d at 544, whereas the relevant local and national ethical canons provide a useful guide for adjudicating motions to disqualify, they are not controlling. In the instant case, the district court attached unwarranted significance to the Model Rules and to the general provision on conflict of interest. Such inflexible application of a professional rule is inappropriate because frequently it would abrogate important societal rights, such as the right of a party to his counsel of choice and an attorney's right to freely practice her profession. See Woods v. Covington County Bank, 537 F.2d 804, 813 (5th Cir. 1976). A court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake. Among the factors that we have considered in the past are "whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." Dresser, 972 F.2d at 544. As we noted in another action to disqualify counsel, "The rule of disqualification is not mechanically applied in this Circuit." Church of Scientology of

<u>California v McLean</u>, 615 F.2d 691, 693 (5th Cir. 1980). All of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.

The district court's finding of a conflict of interest between Kenney and the FDIC, and the subsequent imputed disqualification of the rest of the LMHT&B law firm, is improper under the facts of this case. Ideally, conflict of interest problems should be settled between the attorney and his client. Where an attorney's testimony may prejudice only his own client, the opposing party should have no say in whether or not the attorney participates in the litigation as both advocate and witness. It is generally proper for an opposing party to bring conflict of interest matters to the attention of the court. <u>American Airlines</u>, 972 F.2d at 611. "Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment." MODEL RULE 1.7 cmt. (1992). Similarly, the comment to Texas Rule 3.08 advises that a conflict of interest problem should be solved by the lawyer and his client without interference or harassment by the opposing counsel.[14]   A

---

[14]   Comment 10 explains that Rule 3.08 applies to situations where the opposing party is disadvantaged by a lawyer serving as both advocate and witness. However, the comment cautions that:
   "[the Rule] should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice.  For example, a lawyer should not seek to disqualify an opposing lawyer under this Rule merely because the opposing lawyer's dual roles may involve an improper conflict of interest with respect to the opposing lawyer's client, for that is a matter to be resolved between the lawyer and client or in a subsequent disciplinary hearing. Likewise, a lawyer should not seek to disqualify an opposing lawyer by unnecessarily calling the lawyer as a witness. Such

22

tortured justification for disqualification such as that offered by U.S. Fire, premised on a purported possible conflict of interest sometime in the future, suggests not so much a conscientious professional concern for the profession and the client of the opposing counsel as a tactic designed to delay and harass.

### 2. The Appearance of Impropriety

In addition to the proposed conflict of interest justification, the district court appeared to premise its disqualification of counsel for the FDIC on an appearance-of-impropriety rationale. Basing its bad faith analysis on a balancing of competing interests, the lower court summarily discounted the FDIC's consent to continued representation by LMHT&B. The district court determined that the FDIC's consent was preempted by "questions of ethics and judicial integrity." It is true that among the historical justifications for the lawyer-witness rule is the widely-held view that disciplinary rules, in addition to protecting clients, "are also for the protection of the bar and the integrity of the court." Harold A. Brown & Louis M. Brown, <u>Disqualification of the Testifying Advocate--A Firm Rule</u>, 57 N.C. L. Rᴇᴠ. 597, 602 (1979). Accordingly, where public confidence in the legal system may be jeopardized by an attorney serving in the dual role of advocate and witness, some courts have disqualified both the attorney and the attorney's firm. <u>See, e.g., FDIC v. Isham</u>, 782 F.

---

unintended applications of this Rule, if allowed, would subvert its true purpose by converting it into a mere tactical weapon."
Tᴇx. Rᴜʟᴇ 3.08 cmt. 10 (1990).

23

Supp. 524, 528 (D. Colo. 1992). In the instant case, however, we do not find an erosion of public faith in the judicial system so likely as to warrant the disqualification of the non-testifying members of LMHT&B.

Moreover, both courts and commentators generally have rejected the mere appearance of impropriety as a rationale for the lawyer-witness rule. Proponents of the rationale have argued that an appearance of impropriety is created when a lawyer testifies, because a fact finder may believe that the lawyer is tailoring her testimony to serve her client's interests. Commentators have noted, however, that the same objection might be raised against former counsel, because an appearance of impropriety would persist whether the lawyer is disqualified as an advocate or not. An advocate testifying as a witness would be no more readily impeachable for bias than a former advocate. See GEOFFREY C. HAZARD & W. WILLIAM HODES, 1 THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT, § 3.7:102, at 679 (1994). Either way, due to the possibility of continuing loyalty to the client or the lawyer's expectation of future representation, the former counsel's testimony would be equally suspect. "The fact is that witnesses who at one time represented a litigant are likely to be impeachable for interest for any number of reasons, and forcing their firm to resign from the particular case is not likely to resurrect their credibility." Brown & Brown, 57 N.C. L. REV. at 611. In other words, compelling a law firm to withdraw from a particular case is not likely to resurrect the credibility of a testifying associate who once

represented one of the litigants. Such a witness will remain impeachable for interest for a variety of reasons.

Neither the ABA nor the drafters of the Texas canons have relied on the appearance of impropriety as a justification for the lawyer-witness rule. In examining the traditional reasoning for the proscription, the ABA acknowledges the weaknesses of the appearance of impropriety rationale. ABA/BNA LAWYER'S MANUAL ON PROFESSIONAL CONDUCT, 61:501 (1984). The Model Code did not rely on the appearance of impropriety as a justification for the lawyer-witness rule. The Texas Code does not base its caution against the testifying lawyer on an appearance of impropriety, but on the notion that a lawyer serving as advocate is a less effective witness. Texas Code EC 5-9, EC 5-10. Similarly, with regard to the lawyer-witness prohibition, the comments to both the Model Rules and the Texas Rules emphasize the possibility of confusion between an attorney's dual roles. Neither comment mentions the appearance of impropriety as a justification for the rule.

We have held that application of the disqualification rule requires a balancing of the likelihood of public suspicion against a party's right to counsel of choice. Cossette v. Country Style Donuts, Inc., 647 F.2d 526, 530 (5th Cir. 1981). However, rather than indiscriminately gutting the right to counsel of one's choice, we have held that disqualification is unjustified without at least a reasonable possibility that some identifiable impropriety actually occurred. Woods, 537 F.2d at 813. A disqualification inquiry, particularly when instigated by an opponent, presents a

25

palpable risk of unfairly denying a party the counsel of his choosing. Therefore, notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification, particularly the disqualification of an entire firm, is a sanction that must not be imposed cavalierly.

In view of the particular facts of this case, we find that the FDIC's right to the counsel of its choice outweighs the harm of possible public suspicion. We do recognize that preservation of a popular faith in the judicial system is a primary consideration, and that lawyers generally should avoid even the appearance of impropriety. "It does not follow, however, that an attorney's conduct must be governed by standards which can be imputed only to the most cynical members of the public." Woods, 537 F.2d at 813. As noted in the comments to both the Model Rules and the Texas Rules, an opponent may be tempted to invoke the disqualification rule for purposes of harassment. Unhappily, as often as the rule is misused, the profession is disserved. When, for purely strategic purposes, opposing counsel raises the question of disqualification, and subsequently prevails, public confidence in the integrity of the legal system is proportionately diminished. "Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary." Woods, 537 F.2d at 813.

We find that no practical purpose would be served by disqualifying the law firm representing the FDIC. Under the facts of this case, we do not believe that there would be such an appearance of impropriety in the continued representation of the FDIC by LMHT&B as to warrant the firm's disqualification. On the contrary, under these circumstances, should U.S. Fire succeed in forcing the withdrawal of FDIC's counsel of choice, public faith in the integrity of the legal system is more likely to be undermined than vindicated.[15] Any perceived bias on the part of the testifying lawyers representing the FDIC would not be cured by withdrawal of either the lawyers themselves or their firm. Driven solely by undue preoccupation with the disqualification issue, prolonged delay in addressing the merits of a case, in and of itself, can do little to instill confidence in the judicial system. Moreover, the district court's disdain of the FDIC's informed consent to continued representation by LMHT&B was contrary to the substance and spirit of the lawyer-witness rule. As previously explained, we find the possibility of a conflict of interest between Kenny and the FDIC

---

[15] Disturbingly, the rule on disqualification presupposes that lawyers are more prone to perjury than other witnesses. This assumption in itself may do more to erode the public's faith in judicial integrity than any perceived appearance of impropriety. "What is likely to reduce public confidence in lawyers and legal ethics is the [lawyer-witness] rule's existence, because it emphasizes the impeachability and even the untrustworthiness of lawyer's testimony." Brown & Brown, 57 N.C. L. REV. at 613. Furthermore, even if it is conceded that a fact finder may be suspicious of a lawyer witness, this rationale would justify no more than a narrow, waivable proscription against advocates testifying, and not the broad, traditional rule that acknowledges no exception regardless of client consent. See Robert P. Schuwerk & John F. Sutton, A Guide to the Texas Disciplinary Rules of Professional Conduct, 27A HOUS. L. REV. 1, 317 (1990).

too remote to justify disqualification of her entire firm. For the foregoing reasons, we hold that, as to the law firm of LMHT&B, the FDIC's right to the counsel of its choice must not be repudiated. LMHT&B may continue to represent the FDIC in the instant action.

## Jeff Hurt

U.S. Fire seeks disqualification of Hurt based primarily on its asserted discovery defense. The blanket bond issued to Irving Savings by U.S. Fire conditioned coverage on Irving Savings' filing notice and proof of loss no more than 100 days after discovery of the covered loss. Irving Savings retained Hurt to represent it in several collection matters. U.S. Fire contends that Hurt discovered facts about a potential loss more than 100 days before Irving Savings filed the appropriate notice and proof of loss. Because this discovery would potentially void the policy, U.S. Fire has indicated it will call Hurt as a witness at trial. U.S. Fire further contends that the lawyer-witness rule prohibits Hurt from representing Irving Savings and the FDIC. The district court held that Hurt is a necessary witness and that, as such, the lawyer-witness rule requires his disqualification. The FDIC's consent notwithstanding, we agree that Hurt must be disqualified, because he will likely be compelled to furnish testimony that may be substantially adverse to his client.

The lawyer-witness rule enunciated in three of the four relevant ethical canons requires Hurt's disqualification. Only Texas Rule 3.08 recognizes an exception for client consent. The lawyer-witness rules of both the Northern District and the Model

Code mandate the withdrawal of an advocate once it becomes apparent that his testimony may be prejudicial to his client. Model Rule 3.7(a) makes no distinction between testimony that is adverse to a client and testimony made on behalf of a client. In contrast to its approach to the imputed disqualification of an entire law firm, the Model Rule flatly asserts that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." MODEL RULE 3.7(a) (1992).

Whereas disqualification of the entire LMHT&B firm would be a penalty disproportionate to the potential harm at issue, the disqualification of one or two attorneys would not work such a substantial hardship on the FDIC that their cause would be unfairly injured. Hurt's participation at trial as both advocate and witness would compromise his effectiveness and needlessly confuse his role. These reasons are among those traditionally cited for the lawyer-witness proscription and they justify articulation of the rule within the ethical guidelines of the profession. Unlike an imputed disqualification of his entire firm, Hurt's disqualification is premised on a tangible and unavoidable scrambling of roles. Therefore, on the basis of Hurt's likely testimony with regard to the discovery issue, the district court properly granted U.S. Fire's motion to disqualify Hurt.[16] In the instant case, the

---

[16] Although Hurt's disqualification is proper as based on the discovery defense of U.S. Fire, it is not justified by the bad faith defense. The district court found that U.S. Fire's bad faith affirmative defense required the withdrawal of the entire LMHT&B law firm. In the bad faith context, no explicit determination was made as to Hurt in particular, but it is understood that as a partner with LMHT&B, Hurt would be disqualified if the firm is

disqualification of Kenney and Hurt notwithstanding, as long as LMHT&B is not required to withdraw, the FDIC's right to its counsel of choice is not unduly abridged.

After a review of the facts and <u>de novo</u> consideration of the relevant ethical standards, we find that the disqualification order of the district court is overly expansive. The district court correctly reasoned that the lawyer-witness rule requires the withdrawal of both Kenney and Hurt. However, careful examination of the asserted purposes of the rule belies the notion that, in this instance, the profession is served by disqualification of the entire law firm. Although the various relevant canons promulgate different versions of the proscription against an attorney serving as both advocate and witness, the underlying rationale common to each of them is protection of the client and the opposing party. These interests will not be served by depriving the FDIC of the right to continued representation by the law firm it has chosen. U.S. Fire has failed to offer any convincing argument that its motion to disqualify LMHT&B serves a purpose any more noble than dilatory maneuvering.

## V.  CONCLUSION

For the reasons stated in this opinion, and with regard to the particular facts of this case, we hold that Hurt must be disqualified as counsel for the FDIC, but that other attorneys

---

disqualified. As we have explained, the district court erred in finding that the bad faith claim required disqualification of LMHT&B. For the same reasons, U.S. Fire's bad faith defense does not justify the disqualification of Hurt.

associated with LMHT&B may continue the representation. Because Hurt is likely to be called as a witness at trial, the district court correctly disqualified him by applying the lawyer-witness rule promulgated variously in the Northern District Rules, the Texas Rules, the Model Rules and the Model Code. Therefore, we AFFIRM the disqualification of Hurt as ordered by the district court. However, to the extent that the district court found that Hurt's entire law firm must withdraw, the district court accorded insufficient deference to the right of the FDIC to counsel of its choice. Therefore, to the extent that it disqualifies the LMHT&B law firm, we VACATE the district court's order and we REMAND the matter with instructions to deny the motion.

AFFIRMED IN PART, REVERSED IN PART.